**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| SCOTT SLOANE, | ) | 3:11-cv-00008-LRH-WGC |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF U.S. MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| STATE OF NEVADA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This Report and Recommendation is made to the Honorable Larry R. Hicks, United States District Judge. This action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Currently before the court are three (3) summary judgment motions:

1. Motion for Summary Judgment filed by Defendants Renee Baker, David McNeely, and Claude Willis. (Doc. # 61.)[1] Plaintiff Scott Sloane opposed (Doc. # 68) and Baker, McNeely and Willis replied (Doc. # 70);

2. Motion for Summary Judgment filed by Defendant Tom Prince. (Doc. # 84.) Sloane opposed Doc. # 90) and Prince replied (Doc. # 94); and

3. Sloane's Motion for Partial Summary Judgment filed against Prince only (Doc. # 78). Prince opposed (Doc. # 84) and Sloane replied (Doc. # 89).

---

[1] "Doc. # __" refers to the court's docket number.

1   Also before the court are Sloane's Motions to Strike (Docs. # 67, # 91).[2]

2   After a thorough review, the court recommends Baker, McNeely and Willis's motion be granted

3   in part and denied in part, Prince's motion be granted, Sloane's motion for partial summary be denied

4   and Sloane's motions to strike be denied.

5   **I. BACKGROUND**

6   At all relevant times, Plaintiff Scott Sloane was an inmate in the custody of the Nevada

7   Department of Corrections. (Pl.'s Am. Compl. (Doc. # 48) at 1.) This litigation arises from events that

8   took place while Sloane was housed at the Ely State Prison ("ESP") in Ely, Nevada. (*Id.*) Defendants

9   are Renee Baker, former Associate Warden at ESP; David McNeely, Administrative Services Officer

10   II at ESP; Claude Willis, Correction Casework Specialist III at ESP; and Tom Prince, former Lieutenant

11   and shift supervisor at ESP (collectively "Defendants" unless referred to individually). (Doc. # 61 at 3.)

12   Sloane, a *pro se* litigant, brings this action pursuant to 42 U.S.C. section 1983. He contends Defendants

13   violated his First Amendment right to the free exercise of religion. (Doc. # 48 at 4-7.)

14   On screening, the court determined Sloane's First Amendment claim against Baker, McNeely

15   and Willis (Count I) may proceed. (Doc. # 6 at 5.) On January 30, 2012, the court granted Sloane leave

16   to amend his complaint to add Prince as a defendant to this claim.[3] (Doc. # 47.) Sloane did so in an

17   Amended Complaint filed the same day. (Doc. # 48.)

18   Sloane alleges he is Jewish by birth. (*Id.* at 3.) During the Jewish holiday of Passover, he

19   observes a kosher diet and uses certain supplies to perform Passover Seder rituals.[4] (*Id.*) According to

20

21   [2] The court dismissed Sloane's claims against Defendants State of Nevada, Nevada Department of Corrections, E.K.

22   McDaniel and Howard Skolnick. (Screening Ord. (Doc. # 6) at 5.) Thus, Defendants Baker, McNeely, Willis and Prince are the only remaining defendants in this case.

23   [3] In that same Order, the court denied Sloane's motion for leave to amend his complaint to allege an equal protection

24   claim against Defendants. (*See* Doc. # 47 at 6-8.) Thus, to the extent Sloane alleges an equal protection claim here against any of the defendants, the court will not consider it.

25   [4] "Seder" is a fifteen-part Jewish ritual feast that includes kosher food and storytelling and occurs an hour after

26   sundown on the first night, or first two nights, of Passover to mark the beginning of the holiday. *See* Seder – What is a Passover Seder, http://judaism.about.com/od/holidays/a/What-Is-A-Passover-Seder.htm (last visited Oct. 29, 2012); Judaism

27   101: Pesach: Passover, http://www.jewfaq.org/holiday a.htm (last visited Oct. 29, 2012); *see also Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir. 1989), discussed *infra* at p. 19.

28   2

Sloane, he informed prison officials at ESP of his Jewish faith when he entered into custody in 1985. (*Id.*) While at ESP he received kosher food and Seder supplies for the first and second Seder of Passover in 2007, 2008 and 2009. (Doc. # 6 at 3.)

The gravamen of Sloane's amended complaint is two-fold. He claims that during Passover in 2010, which began on March 29 and ended on April 6, he was denied supplies to perform early evening Seder rituals on March 29, 2010, the first night of Passover. (Doc. # 48 at 3.) The second part of Sloane's First Amendment claim is that he was denied food consistent with a kosher diet on March 29, 2010, and on April 3, 2010. (*Id.* at 5.)

More specifically, first, Sloane alleges Willis failed to provide him with certain supplies necessary to perform first Seder on March 29, 2010. (*Id.* at 4.) He claims Willis "had control of these supplies . . . but refused to deliver them on March 29, 2010 . . . even though . . . evidence by way of documents clearly supported Plaintiff's argument that the 'First Seder' was March 29, 2010." (*Id*.) Additionally, Sloane alleges McNeely refused to correct Willis's failure to deliver his Seder supplies even though "McNeely was notified per Emergency Grievance . . . that the 'The First Seder' supplies hadn't been delivered and that the 'First Seder' ritual was still a few hours away." (*Id.*) Sloane states "McNeely knew about the 'First Seder' and the need for the supplies as early as March 2, 2010 . . . but refused to correct the egregious violation by delivering the ritual supplies in time to be used for 'The First Seder.'" (*Id.*)

Similarly, Sloane alleges Baker "did in fact know about the events of the Seder rituals . . ." because she was copied on a March 3, 2010 communication from McNeely to Sloane pertaining to first and second Seder. (*Id.* at 5.) Sloane also alleges that on March 29, 2010, she was "notified [by] an Emergency Grievance received by [the] Shift Lieutenant . . . [which] detailed the urgency of the situation pertaining to the [Seder] supplies . . . and the potential ramifications of being denied these supplies . . . ." (*Id*.) Despite knowing all of this, Sloane alleges Baker "failed to take responsibility . . . and failed to act diligently to correct the problem  . . . to ensure that Plaintiff's civil rights concerning religious and the free exercise of it was not violated." (*Id*.)

All of these allegations relate to the first Seder, which according to Plaintiff occurred during the

1    early evening hours of Passover on March 29, 2010. (*Id.* at 4.) Sloane ultimately received the Seder

2    supplies on March 30, 2010 (Doc. # 61-2, Ex. B at ¶ 7), but he never did receive them on March 29,

3    2010, which is the essence of this first component of his cause of action.

4         In a Memorandum on March 26, 2010, entitled "KOSHER FOR PASSOVER MENU

5    **(REVISED)**," McNeely notified ESP's culinary staff that, "Passover will begin on the **evening of**

6    **March 29, 2010**."  (McNeely Decl. (Doc. # 61-1), Ex. A-2 at 7.) (Emphasis in bold added.) Baker was

7    copied on this message, which  was also placed in the file for all ESP staff to consult. (*Id.*) But despite

8    McNeely's more recent representation that Passover began on March 29, 2010, Willis (and Baker) later

9    made a seemingly contradictory representation. Over *three weeks* after the first Seder, Willis responded

10   to Sloane's Informal Grievance filed on March 29, 2010, stating:

> After diligent search, calls, emails by Administration Officials, it was determined that
> [Passover] was to commence on March 30th, 2010, not March 29th, 2010 as you have
> advised. Any misunderstandings are unfortunate and not intended to disrupt or interfere
> in any way with your celebration. Every effort was made to make sure the items were
> delivered to include a special costly freight delivery of Aleph Institute approved items.
> No violation occurred.

15   (Doc. # 68-1, Ex. 19 at 79.) Baker approved this response. (*Id.*) Additionally, in an unsigned and undated

16   response to Sloane's April 2, 2010 kite addressed to McNeely, written in what appears to be McNeely's

17   handwriting, the responder refers to Passover as occurring "March 30 – April 6" (McNeely Decl. (Doc.

18   # 61-1), Ex. A-5 at 22), despite his earlier acknowledgment that Passover was to commence on

19   March 29. The court will take a closer look at these representations, *infra*.

20        Second, with respect to the kosher diet aspect of his action, Sloane alleges McNeely

21   "intentionally deceived" him about the Passover food provided by ESP on March 29, 2010, and on

22   April 3, 2010. (Doc. # 48 at 5.) He claims the food he received was not "kosher for Passover," as

23   required by his faith. (*Id.* at 5.) Sloane additionally alleges Prince failed to ensure he received a kosher

24   dinner meal on March 29, 2010, even though Prince knew Sloane was approved to receive such a meal.

25   (*Id.* at 5-6.) Sloane alleges Prince intentionally refused to investigate his emergency grievance filed that

26   night, which complained of food that was not kosher for Passover. (*Id.* at 6.)

27        McNeely's defense is that Sloane received kosher for Passover meal items at all relevant times,

28                                                      4

in accordance with ESP's pre-approved Passover 2010 Menu, which was the same as ESP's Passover 2009 menu. (Doc. # 61 at 17.) In his own defense, Prince claims that although he was the shift supervisor on duty the evening of March 29, 2010, he had no authority to retrieve additional kosher food items for Sloane. (Doc. # 84 at 17.)

For these reasons, Sloane contends Defendants violated his First Amendment rights. He sues each defendant in his or her individual capacity (*id.* at 2) and he seeks compensatory and punitive damages (*id.* at 13).

Not all of the defendants are the subject of each the two distinct claims. Below is a table depicting Sloane's allegations against each defendant.[5]

|  | Seder Supplies Issue | Kosher Diet Issue |
|---|---|---|
| Baker | x | |
| McNeely | x | x |
| Willis | x | |
| Prince | | x |

Defendants now move for summary judgment on the grounds that: (a) Sloane fails to demonstrate Defendants' actions were inappropriate under the standards set forth in *Turner v. Safley*, 482 U.S. 78 (1987) (Doc. # 61 at 10-14; Doc. # 84 at 10-14); (b) Sloane fails to adequately allege causation between their acts and his alleged constitutional deprivation (Baker and Prince only) (Doc. # 61 at 6-8; Doc. # 84 at 6-8); and (c) they are entitled to qualified immunity, even if they inadvertently violated Sloane's First Amendment rights (Doc. # 61 at 14-18; Doc. # 84 at 15-18).

---

[5] In his opposition brief, Sloane refers to Baker's responsibility for the alleged non-kosher for Passover food items delivered to him. (Doc. # 68 at 3, 14-15.) However, as the court reads Sloane's amended complaint, his allegations against Baker appear to involve only the Seder supplies. (*See* Doc. # 48 at 5.) This is so even when the court, as it must, construes Sloane's amended complaint liberally. *See Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988) ("In civil rights cases where the plaintiff appears pro se, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt.") (citation omitted). Thus, because Sloane raises the kosher food issue against Baker for the first time in his opposition, the court will not consider it. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 507 (2002) (explaining Federal Rule of Civil Procedure 8(a)(2), at a minimum, requires that the allegations in the complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.") (citation omitted); *see also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1183, at 23 n. 9 (3d ed. 2004) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims.").

## II.  STANDARD OF REVIEW

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See Liberty Lobby*, 477 U.S. at 250.

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Liberty Lobby*, 477 U.S. at 248-50. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp.  Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474,

480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal quotations and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50, 255 (citations omitted).

## III. DISCUSSION

The court will now conduct an analysis of the Seder supplies aspect of Sloane's free exercise claim, which only pertains to Defendants Baker, McNeely and Willis. The court will thereafter turn to an analysis of the kosher diet aspect of his claim, which involves only Defendants McNeely and Prince. Finally, the court will address Sloane's motions to strike.

**A. Seder Supplies**

  ***1. Summary of Evidence***

  On February 28, 2010, Sloane informed McNeely that he was expecting Seder supplies provided by an outside Jewish organization, the Aleph Institute ("Aleph"), which would allow him to perform the first and second Seder on the first two nights of Passover. (McNeely Decl. (Doc. # 61-1), Ex. A-5 at 19.) Sloane stated: "Aleph donates for each Jewish prisoner the material needed for the 'First and Second Seder,' which are the first two nights of Passover." (*Id*.) In this communication, Sloane does not specify the date Seder began, but clearly Baker, McNeely and Willis were advised that Passover began on March 29, 2010 (*Id*., Ex. A-2 at 7.)

  Earlier that year on January 31, 2010, Sloane contacted McNeely and advised him that "Passover this year . . . **begins on the Eve of March 29th** . . . ." (*Id*., Ex. A-5 at 18) (Emphasis in bold added.) Also, as mentioned previously, McNeely himself issued a Memorandum on March 26, 2010, entitled "KOSHER FOR PASSOVER MENU **(REVISED)**," which states, "Passover will begin on the evening of **March 29, 2010**." (*Id*.) (Emphasis in bold added.) Baker was copied on this message, which  was also placed in the file for all ESP staff to consult. (*Id*.) McNeely issued another Memorandum on March 25, 2010, entitled "FAST OF THE FIRSTBORN – **MARCH 29, 2010 (REVISED)**, notifying "All Food Service Staff" that, "No regular Kosher menu meals are to be served to [Sloane] **on Monday, March 29, 2010**." (*Id*., Ex. A-1 at 5.) This Memorandum lists the menu items for March 29, 2010, including "Tuna Pouch in Water" and "Matzo Wafers," with specific reference to Passover beginning on that date. (*Id*.) Baker was similarly copied on this message, which was also placed in the ESP file. (*Id*.)

  On March 2, 2010, McNeely responded to Sloane's February 28, 2010 communication and stated: "Chaplain Stogner is handling this with Aleph and we should receive the available Seder meal items in time." (*Id*. at 19.) Baker was copied on this message, as well. (*Id*.) McNeely does not address in his response to Sloane, or in his declaration, that he was aware the commencement of Seder coincided with the commencement of Passover. But that deduction appears fairly intuitive from a reading of the exchange of messages, particularly since Sloane's February 28, 2010 message about Passover specifically referred to Seder supplies.

1   The first Seder occurred on the evening of March 29, 2010. (Doc. # 6 at 3.) FedEx's "Detailed

2   Results" for tracking the package containing the Seder supplies sent by Aleph shows the Las Vegas

3   FedEx location possessed the package at 11:47 p.m. on March 24, 2010. (Doc. # 61-3, Ex. C-2 at 6.)

4   ESP received the Seder supplies from Aleph at 3:44 p.m. on March 29, 2010, as indicated on ESP's

5   FedEx Receiving Log. (*Id*., Ex. C-1 at 4.) This receiving log also shows the supplies were "delivered to

6   McNeely." (*Id.*) Sloane asserts that Willis, to whom the box of Seder supplies were addressed (*id*.),

7   refused to deliver them to him (Doc. # 48 at 3, 4).

8   When he did not receive his Seder supplies, Sloane filed an Emergency Grievance at 3:51 p.m.

9   on March 29, 2010, wherein he complained, *inter alia*, about the absence of Seder supplies. (Doc. # 68-

10  1, Ex. 7 at 26.) At 4:30 p.m. ESP supervisor Jones responded: "The AWP [Associate Warden of Prison

11  Baker] & ASO [Administrative Services Officer McNeely] are aware of the problem and are attempting

12  to correct it." (*Id*. at 26.)

13  Sloane filed a second Emergency Grievance at 6:00 p.m. on March 29, 2010, wherein he claimed

14  ESP personnel are "refusing to give me the supplies necessary for the Seder ritual approved and sent by

15  Aleph. These supplies are Matzah, grape juice and various other supplies. I'm being told that the

16  supplies will be given tomorrow. That will be to [sic] late. The first Seder is tonight." (Doc. # 68-1,

17  Ex. 23 at 96-97.) Prince, the on-duty lieutenant, responded at 6:50 p.m. by stating: "Not an emergency

18  – File normal channels . . . This has been addressed several times by Lt. Jones." (*Id*. at 97; Doc. # 84,

19  Ex. G at ¶¶ 5-7). Whether Lt. Prince attempted to discuss the problem with Defendants Baker and

20  McNeely is unknown, but there is no representation by Defendants Baker, McNeely and Willis that

21  Lt. Prince did anything more than reject the grievance.

22  Later that night, after not receiving Seder supplies, Sloane filed an Informal Grievance.[6] (Doc.

23  # 68-1, Ex. 19 at 79.) This grievance contained the same allegations as his Emergency Grievances,

24  including that he did not receive Seder supplies on that date. (*Id*. at 80-84.) Over *three weeks* later, on

25  April 22, 2010, Willis provided the formal ESP response, which was approved by Baker, and it reads

26

27      [6] Sloane later filed a First Level Grievance on May 5, 2010 (Doc. # 61-2, Ex. B at 9-12) and a Second Level Grievance on June 11, 2010 (*Id*. at 6-8), both of which were denied.

28                                              9

1  in its entirety:

2        After diligent search, calls, emails by Administration Officials, it was determined that
       [Passover] was to commence **on March 30th, 2010, not March 29th, 2010** as you have
3       advised. Any misunderstandings are unfortunate and not intended to disrupt or interfere
       in any way with your celebration. Every effort was made to make sure the items were
4       delivered to include a special costly freight delivery of Aleph Institute approved items.
       No violation occurred.

5

6  (*Id.* at 79) (Emphasis in bold added.) The court again points to the discrepancy between this response

7  and McNeely's earlier representation in the March 26, 2010 Memorandum that "Passover will begin on

8  the evening of **March 29, 2010**," (McNeely Decl. (Doc. # 61-1), Ex. A-2 at 7) (emphasis in bold added),

9  or McNeely's specific references to Passover beginning on March 29, 2010, in the March 25, 2010

10  Memorandum (*id.*, Ex. A-1 at 5.) As mentioned previously, Sloane ultimately received the Seder

11  supplies on March 30, 2010. (Doc. #61-2, Ex. B at ¶ 7.)

12        Also on March 30 2010, Sloane submitted a kite to McNeely, which reads as follows:

13        Sir, I would like to know whose decision it was to deny me the ritual material sent to me
       from Aleph to be used during the 1st Seder ritual of Monday . . . [March] 29th, 2010,
14       after sundown, an obligated ritual to an observant Jew. Something the last three years
       alone, here at (ESP) I've participated in. I would appreciate your response.

15

16  (Doc. # 68-1, Ex. 11 at 46; Doc. # 61-1, Ex. A-5 at 20.) On April 5, 2010, Willis responded:

17        You were advised at your cell door that multiple emails and phone calls with former ESP
       Chaplain and Aleph Institute contact Rabbi Katz were conducted to ensure that you
18       would be able to observe Passover. There was no decision rendered for any denial. In fact
       a concerted effort was made to make sure every aspect of this celebration would be
19       observed. I am responding for the ASO [McNeely] as neither one of us is a trained
       Chaplain. Every good faith effort was made to to [sic] assist you and any other Passover
20       Celebrants.

21  (Doc. # 68-1, Ex. 11 at 46; Doc. # 61-1, Ex. A-5 at 20.)

22        Baker, McNeely and Willis's failure to provide Sloane with the Seder supplies on March 29,

23  2010, is the gravamen of this aspect of his First Amendment claim.

24        ***2. The Parties' Positions***

25        As noted above, Sloane alleges in his amended complaint that Willis failed to deliver supplies

26  necessary to perform first Seder; that McNeely refused to correct Willis's failure, even when urgently

27  notified by Sloane; and that Baker also failed to act diligently and provide Sloane with Seder supplies

28                                        10

1   even though she knew Sloane needed them to practice his faith. (Doc. # 48 at 4-5.)

2       In support of their motion for summary judgment, Baker, McNeely and Willis argue the delay

3   in providing Sloane his Seder supplies is not attributable to them but to Aleph's late delivery of the

4   supplies. (Doc. # 61 at 12.) These defendants argue:

5           [T]he items from the Aleph institute did not arrive in a timely manner, which was beyond
            the control of the Defendants. [Footnote omitted.] Thus, the appropriate policy was in
6           place, but due to reasons that the Defendants could not control, the appropriate policy
            could not be implemented.
7   (*Id.*)

8       These defendants contend that their actions were appropriate when analyzed under the *Turner*

9   standard and that their actions are protected by qualified immunity.[7] (*Id.* at 12, 17.) The defendants assert

10  even if they "inadvertently violated Plaintiff's First Amendment rights due to their mistake of fact, they

11  are nevertheless entitled to summary judgment based upon the doctrine of qualified immunity." (*Id.* at

12  18) (Citation omitted.)

13      Conversely, in his opposition brief, Sloane argues several genuine issues of material fact exist

14  so as to preclude summary judgment. Specifically, he raises the issue of whether Willis "had a duty to

15  deliver the Seder supplies on March 29, 2010, or because his shift was fifteen (15) minutes from ending

16  . . . chose to wait until [March 30th, 2010] to pass out the Seder supplies . . . ." (Doc. # 68 at 3.) Sloane

17  further raises the issue of whether Willis "attempted to cover up . . ." his role in the delayed delivery of

18  the Seder supplies "attempting to change the date of Passover – First Seder, to March 30th . . . ." (*Id.* at

19  3) (citing April 22, 2010 Grievance Response (Doc. # 68-1, Ex. 19 at 79).)

20      Additionally, Sloane raises the issue of whether McNeely "had a duty to deliver the Seder

21  supplies that were currently in his possession . . ." once Sloane notified McNeely by way of the 3:51 p.m.

22  Emergency Grievance that the he had not received them. (Doc. # 68 at 2.) Similarly, Sloane raises the

23  issue of whether Baker "had a duty to either order [McNeely] to deliver . . . the Seder supplies . . . or take

24  ────────────────

25      [7] Qualified immunity must be pled by the defendant as an affirmative defense. *Harlow v. Fitzgerald*, 457 U.S. 800,
    815 (1982); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Here, Willis, Baker and McNeely never filed an Answer. Instead,
26  they timely filed a motion to dismiss Sloane's original complaint (Doc. # 17), which was denied (Doc. # 47). And later, after
    Sloane filed his amended complaint, they timely filed the instant motion for summary judgment (Doc. # 61). In each motion,
27  these defendants raised qualified immunity as a defense.

28                                                  11

possession of the supplies and deliver them herself." (*Id.* at 3.) Ultimately, for these reasons, Sloane asserts "[t]here is clearly a genuine issue of fact" (*id.* at 9) as to "what the defendants [sic] duties were to the Plaintiff in protecting his First Amendment, free exercise of religion rights throughout Passover 2010" (*id.* at 8).

### 3. Legal Standards

#### a. Free Exercise of Religion

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. Inmates retain the core protections afforded by the First Amendment, "including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam)). The fact of lawful incarceration, however, necessarily limits this right, "'a retraction justified by the considerations underlying our penal system.'" *O'Lone*, 482 U.S. at 348 (internal quotations and citation omitted). Thus, while this basic constitutional right "is to be jealously guarded . . ." *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993), an inmate "retains [only] those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

In order to implicate the Free Exercise Clause, the inmate's belief must be religious in nature and sincerely held. *See Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (internal quotations and citation omitted); *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008) (adopting the "sincerity test" set forth in *Malik, supra*). (The defendants do not assert Sloane was not sincere in the exercise of his religious beliefs.) Inmates with such beliefs have "[t]he right to exercise [their] religious practices and beliefs . . . ." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam) (citing *O'Lone*, 482 U.S. at 348). A free exercise violation occurs when the defendants burden the practice of an inmate's religion by preventing the inmate from engaging in sincere religious conduct. *See Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997), *overruled in part by Shakur*, 514 F.3d at 885. A mere inconvenience does not give rise to a violation; the burden imposed must be substantial. *Freeman*, 125 F.3d at 737.

/ / /

12

1        b. Qualified Immunity

2        Qualified immunity shields government officials from the burdens of litigation and civil damages

3   liability " insofar as their conduct does not violate clearly established statutory or constitutional rights

4   of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982);

5   *accord Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citations omitted). As a general matter,

6   qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."

7   *Malley v. Briggs*, 475 U.S. 335, 341 (1986).The Supreme Court has developed a two-prong analysis for

8   resolving qualified immunity claims. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on*

9   *other grounds by Pearson,* 555 U.S. at 236.  Importantly, the district court has the discretion to decide

10  which of the two prongs to address first. *Pearson*, 555 U.S. at 226.

11       One prong requires the court to consider whether "[t]aken in the light most favorable to the party

12  asserting the injury . . . the facts alleged show the [defendant's] conduct violated a constitutional right."

13  *Saucier*, 533 U.S. at 201; *accord Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). When identifying

14  the constitutional right allegedly violated, the court must define the right "at the appropriate level of

15  specificity . . . ." *Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir. 2010). "[T]he court must define the right

16  more narrowly than the constitutional provision guaranteeing the right, but more broadly than the factual

17  circumstances surrounding the alleged violation." *Lyons v. Busi*, 566 F.Supp.2d 1172, 1190 (E.D. Cal.

18  2008) (citing *Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir.1995)).

19       The other prong requires the court to determine "whether the right was clearly established" at the

20  time of the violation. *Saucier*, 533 U.S. at 202. This determination is legal and objective, but it is also

21  fact-specific.  *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (citations omitted); *Saucier*, 533 U.S. at 202.

22  To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official

23  would understand that what [the official] is doing violates that right." *Anderson*, *supra*, 483 U.S. at 640;

24  *accord Rodis v. City & County of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009). Of course, a

25  violation in this instance must entail a substantial burden on Sloane's practice of religion. *See Freeman*,

26  125 F.3d at 737.

27       Importantly, the court need not identify an identical prior action to conclude that the right is

28                                                          13

clearly established, "but . . . in the light of pre-existing law *the unlawfulness must be apparent*." *Anderson*, 483 U.S. at 640 (citations omitted) (emphasis added). Of course, in evaluating pre-existing law the court should first consider binding precedent, but absent binding precedent, the court should consider all relevant precedents. *See Elder*, 510 U.S. at 516 ("A court . . . should . . . use its "full knowledge of its own [and other relevant] precedents.") (brackets in original); *Dunn*, 621 F.3d at 1203 (a court may look to precedent from other circuits).

However, even if the court finds a plaintiff has alleged a violation of a clearly established constitutional right, the defendant may still be entitled to qualified immunity. "If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205; *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006).[8]

### 4. Analysis

As an initial matter, the defendants' arguments pursuant to *Turner, surpa*, are inapplicable here. *Turner* provided an analytical framework to evaluate the reasonableness of a prison *regulation* impinging on a constitutional right. 482 U.S. at 91. But these defendants accurately assert that Sloane has challenged the conduct of prison officials, not a prison regulation or policy. "[Sloane] does not allege that a prison regulation or policy has infringed upon his constitutional rights." (Doc. # 61 at 16; Doc. # 84 at 16) (Original emphasis.) Thus, by virtue of the defendants' own recognition, *Turner* is inapplicable to this case because no prison regulation, or conduct pursuant to such a regulation, is being challenged. *See Shaheed v. Winston*, 885 F.Supp. 861, 869 (E.D. Va. 1995) (explaining that an argument under Turner "is not properly invoked" unless the plaintiff first "show[s] the challenged regulation impinges on a constitutional right . . . .") (internal quotations and citation omitted).

In any event, the defendants' point is inapposite. Sloane need not challenge a prison regulation

---

[8] This so-called "third prong" of the *Saucier* analysis has been recognized by certain courts of the Ninth Circuit. *See, e.g., Alexander v. City & County of Honolulu*, 545 F.Supp.2d 1122, 1134 (D. Haw. 2008) (citing *Skoog v. County of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006)). The Ninth Circuit also recognizes a two-part test for qualified immunity under *Saucier* that conflates the second and third prongs. *See Alexander*, 545 F.Supp.2d at 1134 n.7 (citing *Preschooler II v. Clark County School Bd. of Trs.*, 479 F.3d 1175 (9th Cir. 2007)); *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004)). This may simply be a matter of style, not substance. Nevertheless, the court considers the same factors whether applying a two- or three-part test.

14

1  or policy in order to allege a constitutional violation under section 1983. A government official sued in

2  his or her individual capacity is a "person" subject to suit for damages under section 1983 for actions

3  taken in his or her official capacity–actions which are also described as actions taken "under color" of

4  state law. *Hafer v. Melo*, 502 U.S. 21, 27 (1991). Thus, as a threshold *procedural* matter, it is sufficient

5  under section 1983 that Sloane challenges the official conduct of an individual state actor and alleges

6  the violation of a federally-protected right. Sloane has done precisely that here. It is entirely a different

7  matter, however, whether Sloane's *substantive* allegations actually establish a constitutional violation.

8       Consequently, the only issue before the court is whether these defendants (Baker, McNeely and

9  Willis) are entitled to qualified immunity. The first step of this analysis is to identify and define the

10  constitutional right at issue.

11       The court defines the relevant constitutional right as the right of a Jewish prisoner to perform

12  religious rituals. This right is clearly established, including in the Ninth Circuit. *See O'Lone*, 482 U.S.

13  at 348 (holding prisoners "retain protections afforded by the First Amendment," including the free

14  exercise of religion); *McElyea*, 833 F.2d at 197 ("The right to exercise religious practices and beliefs

15  does not terminate at the prison door."). Furthermore, in previous years, the defendants recognized the

16  observation of the Jewish Passover holiday, including Seder. (Doc. # 6 at 3.) Clearly, then, the contours

17  of Sloane's constitutional right to perform Seder were sufficiently clear that a reasonable official,

18  including Baker, McNeely and Willis, would understand that failing to provide Sloane with Seder

19  supplies would violate that right. *Anderson*, 483 U.S. at 640. In fact, the defendants acknowledged

20  Sloane's right to perform Seder rituals when they agreed, in this case, to provide Sloane with Seder

21  supplies. (McNeely Decl. (Doc. # 61-1), Ex. A-5 at 18.)

22       Sloane therefore has satisfied one of the two *Saucier* prongs. Thus, for defendants to be entitled

23  to qualified immunity, they must demonstrate under *Saucier*'s other prong (the "first" prong) that their

24  conduct did not violate, i.e. substantially burden, Sloane's clearly established constitutional right defined

25  above. As explained below, the court concludes genuine issues of material fact remain regarding whether

26  each defendant is entitled to qualified immunity. A reasonable jury could find that, under *Saucier*'s

27  "first" prong, each defendant's conduct violated Sloane's clearly established constitutional right. Before

28

15

1   the court conducts this analysis, though, the court will briefly address the defendants' qualified immunity

2   argument that any mistake regarding the commencement of Passover was "inadvertent." (Doc. # 61

3   at 18.)

4        In their motion, the defendants (Baker, McNeely and Willis) cite to *Shaheed v. Winston*, 885

5   F.Supp. 861 (E.D. Va. 1995) for the proposition that negligence not give rise to a free exercise claim

6   under section 1983. (Doc. # 61 at 10.) *Shaheed* is distinguishable from the instant matter. In *Shaheed*,

7   the court expressly found that prison officials' failure to accommodate Ramadan resulted from a

8   "misunderstanding." *Shaheed*, 885 F.Supp at 868. Here, the facts establish there is no such

9   "misunderstanding." Each defendant was aware, despite what the subsequent formal response to the

10  grievance asserted, that Passover commenced on March 29, 2010.[9]

11       The defendants *attempt* to demonstrate that the Seder supplies issue resulted from a mere

12  misunderstanding regarding the commencement date of Passover. As noted above, Willis's response

13  (approved by Baker) to Sloane's March 29, 2010 Informal Grievance states, in pertinent part: "After

14  diligent search, calls, emails by Administration Officials, it was determined that [Passover] was to

15  commence on **March 30th, 2010, not March 29th, 2010** as you have advised. Any misunderstandings

16  are unfortunate and not intended to disrupt or interfere in any way with your celebration." (Doc. # 68-1,

17  Ex. 19 at 79) (Emphasis added.)   In addition, McNeely's response to Sloane's April 2, 2010 kite

18  indicates Passover began on "March 30, 2010," not March 29, 2010. (McNeely Decl. (Doc. # 61-1), Ex.

19  A-5 at 22.) As mentioned previously, this response was undated and unsigned, but the handwriting

20  appears to be McNeely's.[10]

21

22       [9] *Shaheed, supra*, and a case that cites *Shaheed*, *Lewis v. Mitchell*, 416 F.Supp.2d 935 (S.D. Cal. 2005), held that
    negligence alone does "not give rise to a Free Exercise § 1983 claim," *Lewis*, 416 F.Supp.2d at 944 (citing *Shaheed*, 885

23  F.Supp. at 868) and that "negligent violations of the . . . [plaintiff's] right to free exercise of religion" do not create a viable
    section 1983 cause of action, *Shaheed*, 885 F.Supp. at 868. If one accepts the defendants' argument that the failure to provide

24  Sloane his Seder supplies was merely negligent, then perhaps summary judgment should be entered for the defendants.
    However, the defendants' contentions in response to Sloane's grievances that Passover did not commence until March 30,

25  as opposed to their earlier statements that it was scheduled to begin on March 29, create a question of fact which militates
    against summary judgment premised on "negligence" theories.

26
     [10] If, as the defendants' later asserted, Passover actually commenced on March 30 and not on March 29 as initially

27  recognized, then there would have been no "misunderstanding" on the defendants' behalf that would have "disrupt[ed] or
    interfere[d] . . . with [Sloane's] celebration . . ." because (in the defendants' analysis) there would not yet have been any

28  celebration to disrupt.

16

The record before the court, however, belies both of these assertions. As the court has previously noted and explains again below, there is genuine evidence that the defendants knew Passover began on March 29, 2010. In light of this evidence, the timing of the April 23, 2010 response to Sloane's March 29, 2010 Informal Grievance bears close scrutiny: it was issued over *three weeks* after Sloane filed the grievance. (Doc. # 68-1, Ex. 19 at 79.) Similarly, McNeely's response to Sloane's April 2, 2010 kite contains no date. This leaves the court to wonder how long it took McNeely to formulate this response–response that, if true, might support a reasonable mistake theory but so clearly contradicts the evidence in this case. In any event, given the factual uncertainties surrounding the defendants' conduct during the relevant time period, which the court details below and which gives rise to a genuine issue of material fact, this explanation is unpersuasive. The court will now turn to an analysis of *Saucier*'s "constitutional violation" prong.

As noted previously, the defendants concede Sloane did not receive the Seder supplies provided by Aleph in time for the First Seder. (Doc. # 61 at 5.) But this case presents a difficult question because, of course, Sloane ultimately *received* the Seder supplies on March 30, 2010, the second day of Passover. (*Id*; Doc. #61-2, Ex. B at ¶ 7.) The pertinent question, therefore, is whether Baker, McNeely and Willis *substantially burdened* Sloane's free exercise rights by failing to deliver Seder supplies in time for the first Seder on March 29, 2010.

Firstly, the record contains substantial evidence demonstrating Baker, McNeely and Willis knew or should have known Passover began on March 29, 2010. For example, as mentioned above, on January 31, 2010, Sloane contacted McNeely and advised him that "Passover this year . . . begins on the Eve of March 29th . . . ." (McNeely Decl. (Doc. # 61-1), Ex. A-5 at 18.) Further, attached to McNeely's declaration are two memoranda that explicitly reference "March 29, 2010," as the beginning of Passover. (*Id*., Ex. A-1 at 5, Ex. A-2 at 7.)

The record also demonstrates that Sloane was approved to receive the Seder supplies on March 29, 2010 (*id*., Ex. A-5 at 19), and that the defendants knew he had not received the supplies as the time approached–and ultimately passed–to perform the first Seder (Doc. # 68-1, Ex. 7 at 26, Ex. 23 at 96-97, Ex. 19 at 79). As detailed above, Sloane filed multiple emergency grievances and one informal

grievance during the late afternoon and early evening hours of March 29, 2010, informing the defendants that he needed the supplies to perform the first Seder. However, despite knowing the date Passover began and despite ESP's receipt of the Seder supplies on March 29, 2010, Sloane never received the supplies in his cell.

After closely reviewing the record, it is still unclear to the court *why* Sloane did not receive the Seder supplies on March 29, 2010. The defendants repeatedly claim that the delay in ESP's receipt of the supplies from Aleph caused the delayed delivery to Sloane. It is debatable whether Aleph's shipment of the supplies on March 24, 2010 from Las Vegas actually constituted a "delay" in shipment (Doc. # 61-3, Ex. C-2 at 6), that question is relatively irrelevant. The fact remains that ESP received the supplies at 3:44 p.m. on March 29, 2010. This seemingly provided the defendants ample time to deliver the supplies to Sloane, as he was prepared to perform the rituals at sundown which occurred between 6:30 p.m. and 7:30 p.m. that night. (Doc. # 61-1, Ex. B-1 at 11.) At the very least, this presents a question of fact which needs to be resolved.

Notably, however, the defendants fail to account for the roughly three (3) to four (4) hours between their receipt of the supplies from Aleph and the time first Seder was to begin, i.e. thirty (30) to sixty (60) minutes after sundown. Willis offers no explanation for what he (Willis) did between 3:44 p.m., when the Seder supplies addressed to him arrived at ESP, and 4:00 p.m., when he left work. Sloane filed an emergency grievance at 3:51 p.m. complaining about the absence of Seder supplies, but Willis fails to explain why he did not ensure Sloane received them. Further, the record shows Lt. Jones informed Sloane that Baker and McNeely were aware of the Seder supplies issue and that they were "attempting to correct it."[11] (Doc. # 68-1, Ex. 7 at 26.)  But aside from blaming Aleph's late delivery, neither Baker nor McNeely explain why they could not deliver the Seder supplies to Sloane once ESP received them at 3:44 p.m. on March 29, 2010. With these critical factual issues unresolved, the court finds summary judgment is inappropriate on this aspect of Sloane's First Amendment claim.

---

[11] Lt. Jones's representation that Baker was personally attempting to correct the Seder issue is at least suggestive that she (Baker) personally participated in the alleged deprivation. Baker does not contest this representation. Thus, Baker's defense on the grounds of a lack of personal participation is unpersuasive to the court.

Moreover, a Passover Seder is greatly significant to Jewish adherents. *See, e.g., Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir. 1989) (explaining Seder "marks the exodus of the Jewish people from Egypt. It is a most sacred time for believers in the Jewish faith, both for historic reasons and for its celebration of family and community . . . ."). The fact that Sloane was unable to perform the first Seder on March 29, 2010, despite ESP's possession the supplies and despite the defendants' apparent knowledge that Passover began on March 29, 2010, leads the court to conclude that a reasonable jury could find that Baker, McNeely and Willis substantially burdened Sloane's constitutional rights by failing to ensure he received approved Seder supplies in time for Passover.  In other words, genuine issues of material fact exist regarding whether the defendants' conduct violated Sloane's constitutional rights to perform religious rituals mandated by his sincere religious beliefs. Accordingly, the court recommends that the Motion for Summary Judgment (Doc. # 61) should be denied with respect to this aspect (denial of Seder supplies) of Sloane's First Amendment claim.

The court will now turn to the second aspect of Sloane's First Amendment claim–his allegations that McNeely and Prince violated his constitutional right to consume a kosher for Passover meal during Passover in 2010.

**B. Kosher Food**

*1. Summary of Evidence*

Because Sloane often intermixed his allegations regarding the Seder supplies with his complaints about his Passover food, the court will necessarily have to repeat certain facts from the record when presenting the pertinent evidence concerning this aspect of his First Amendment claim.

On January 31, 2010, Sloane informed McNeely of his "kosher for Passover" dietary requirements for the holiday of that year (McNeely Decl. (Doc. # 61-1), Ex. A-5 at 18), which would begin with the first Seder on the evening of March 29 (*id.* at 19). The next day, McNeely advised Sloane that he was "on the list" to receive kosher meals for Passover and that "enough Kosher for Passover food will be ordered." (*Id.*)

As noted above, Passover began on March 29, 2010. (Doc. # 6 at 3.) In the days leading up to Passover, McNeely authored two Memoranda. In a March 25, 2010 Memorandum entitled "FAST OF

19

1    THE FIRSTBORN – MARCH 29, 2010 (REVISED)," McNeely notified "All Food Service Staff" that

2    Sloane would be receiving a kosher for Passover meal on March 29, 2010. (Doc. # 61-1, Ex. A-1 at 5.)

3    McNeely also included a list of menu items for that date, including, inter alia, "Matzo wafers," "Tuna

4    Pouch in Water," and "Macaroons." (*Id.*)

5          In another Memorandum dated March 26, 2010, entitled "KOSHER FOR PASSOVER MENU

6    (REVISED)," McNeely notified "Food Service Cook Supervisor III's" that "Passover will begin on the

7    evening of March 29, 2010. Non 'Kosher for Passover' products may not be consumed from March 29

8    until one hour after sundown on April 6, 2010. The attached Kosher for Passover menu is approved for

9    inmate[] . . . S. Sloane . . . ." (*Id.*, Ex. A-2 at 7.) Each of these memoranda were copied in the ESP file

10   for other ESP staff members to consult. (*See Id.*, Ex. A-1 at 5, Ex. A-2 at 7.)

11         Sloane filed an Emergency Grievance at 3:51 p.m. on March 29, 2010, wherein, in addition to

12   complaining about not receiving his Seder supplies as discussed above, he also objected about his non-

13   kosher for Passover food including "leavened bread and crackers, and tuna fish and cupcakes . . . ."

14   (Doc. # 68-1, Ex. 7 at 26.) At 4:30 p.m. ESP supervisor Jones responded: "The AWP [Associate Warden

15   of Prison Baker] & ASO [Administrative Services Officer McNeely] are aware of the problem and are

16   attempting to correct it."[12] (*Id.* at 26.)

17         Sloane filed a second Emergency Grievance at 6:00 p.m. on March 29, 2010, wherein he claimed:

18   "I haven't eaten since Sunday 11:30 p.m. . . . ESP is . . . refusing to feed me a dinner meal that I can eat

19   without violating the religious code[.]" (*Id.*, Ex. 23 at 97.) Prince, the on-duty lieutenant, responded by

20   stating: "Not an emergency – File normal grievances . . . This has been addressed several times by

21   Lt. Jones." (*Id.*; Doc. # 84, Ex. G at ¶¶ 5-7). Prince never explained to Sloane why this was not an

22   emergency.

23         Further, Sloane claims Prince received but intentionally ignored an Emergency Grievance from

24   him "at approximately 6:50 p.m. . . ." containing allegations that he had not received a kosher for

---

[12] The court previously cited this response in the Seder supplies section of this Report and Recommendation because Sloane's emergency grievance contained complaints about *both* the Seder supplies and the kosher food. Here, the court uses this response as it relates to the kosher food issue.

Passover meal.[13] (Doc. # 48 at 6.) Sloane alleges Prince failed to investigate his grievance even though Prince was in possession of a "memorandum" indicating Sloane was approved for a kosher meal. (*Id.* at 6-7.)

Later that night, as mentioned previously, Sloane filed an Informal Grievance complaining, *inter alia*, that he did not receive a kosher meal on that date. (Doc. # 68-1, Ex. 19 at 79-84.) Additionally, the next day, March 30, 2010, Sloane filed another Emergency Grievance requesting wrapped utensils so that he could eat his lunch in accord with kosher customs. (*Id.*, Ex. 25 at p. 108). This grievance was denied and he was directed to contact culinary. (*Id.*) The next day, March 31, 2010, Sloane filed a kite with McNeely in which he raised concerns about what he understood to be non-kosher, stock or new meal items for Passover, including certain cheese and milk. (*Id.*, Ex. 12 at 49.)

Important to the resolution of the kosher meal component of Sloane's civil rights claim is McNeely's response:

> The entrees are Kosher for Passover; not stock items. . . . This year's cheese is cream cheese not cheese sticks as in past years. . . . The reason some items are different is our previous vendor (La Brinte) is no longer in business and we have only one source this year (Good Source). . . . We have never had milk or milk substitute on the Kosher for Passover menu.

(*Id.*)

Finally, Sloane filed a fourth Emergency Grievance on April 3, 2010, in which he complained about his allegedly non-kosher for Passover meal items (including tuna packs, mustard and peanut butter), and requested a kosher for Passover meal. (*Id.*, Ex. 18 at 76.) The ESP supervisor on duty responded: "Not an Emergency[.] [Y]ou received the items listed on the Kosher for Passover menu for today. File through normal channel." (*Id.*) Again, the author (unidentified) of the response did not explain why this was not an emergency.

ESP diet logs indicate ESP provided Sloane with approved items from its Passover menu during Passover of 2010, i.e. between March 29, 2010 and April 7, 2010. (Doc. # 61-1, Ex. A-4 at 13-16.)

---

[13] In his opposition, Sloane again refers to a "third emergency grievance" filed at "approximately 6:30 p.m." on March 29, 2010, to which he alleges Prince refused to respond. (Doc. # 68-1, Ex. 19 at 83.) Upon close review of the record, the court finds no evidence of such a grievance.

1   Nevertheless, as set forth below, Sloane contends he did not receive kosher for Passover food items on

2   March 29, 2010, and on April 3, 2010. (Doc. # 48 at 5.)

3          **2. The Parties' Positions**

4        Sloane alleges McNeely deliberately misinformed him about the Passover food provided by ESP

5   on March 29, 2010, and on April 3, 2010. (Doc. # 48 at 5.) He claims the food he received was not

6   "kosher for Passover." (*Id.* at 5.) With regard to Prince, he alleges Prince failed to ensure he received

7   a kosher dinner meal on March 29, 2010. (*Id.* at 5-6.) He contends Prince intentionally refused to

8   investigate his grievance filed that night, which complained of food that was not kosher for Passover,

9   even though Prince knew or should have known he was approved to receive a kosher meal. (*Id.* at 6.)

10       In his motion, McNeely contends he is entitled to qualified immunity because the food items

11   delivered to Sloane on the dates in question "were not only approved for the 2010 Passover Menu, but

12   were also identical to those items approved for the 2009 Passover Menu . . . ." (Doc. # 61 at 17.)

13   McNeely further asserts that he is not an "expert[] in a kosher diet and could not reasonably be expected

14   to alter a menu that has been approved . . . and was also used in 2009 for Passover." (Doc. # 70 at 4.)

15   Thus, he contends that even if he "inadvertently violated [Sloane]'s First Amendment rights due to [his]

16   mistake of fact, [he is] nevertheless entitled to summary judgment based upon the doctrine of qualified

17   immunity." (Doc. # 61 at 18.)

18       Much of the language in Prince's separate motion (and his opposition to Sloane's motion for

19   partial summary judgment (*see* Doc. # 84)) is identical to the language in McNeely's motion. Putting

20   that observation aside, the relevant argument Prince sets forth is that he "had no authority to retrieve

21   additional kosher food items . . . ." (Doc. # 84 at 17.) In his declaration, Prince asserts: "I was not in the

22   position to correct any deficiencies regarding the Kosher items . . . that Sloane did or could have

23   received." (Doc. # 84, Ex. G at ¶ 8.) Sloane explains: "My understanding is that issues regarding the

24   practice of religion do not qualify for an emergency grievance. An emergency grievance is only

25   appropriate for security issue or for serious injury/medical issues." (*Id.* at ¶ 7.) Ultimately, Prince argues

26   he "did not have such personal involvement in this matter to establish liability . . . ." (Doc. # 94 at 4.)

27       Conversely, Sloane contends "McNeely had a duty to ensure that [he] was fed only 'kosher for

28

1   passover' food from March through sundown April 6, 2010." (Doc. # 68 at 8.) According to Sloane, this

2   assertion alone, when considered alongside McNeely's contrary position, creates a genuine issue of fact.

3   (Doc. # 68 at 9.) In addition, Sloane alleges Prince, as the shift supervisor on the evening of March 29,

4   2010, "simply refused to help me despite what he has said in his personal declaration again where he

5   says he had no authority." (Doc. # 90 at 11.) Sloane asserts Prince "had an obligation to ensure that

6   [Sloane] was provided a 'kosher for Passover' meal . . ." (*Id.* at 9), but "showed no concern whatsoever

7   toward [Sloane] . . . ." (*id.* at 10).

8       ***3. Analysis***

9       The general legal standards of a free exercise claim and the defense of qualified immunity apply

10  here. Rather than repeat them, the court refers back to those standards set forth in Section III.A.3 of this

11  Report and Recommendation.

12      Of course, inmates have the constitutional right to "food sufficient to sustain them in good health

13  that satisfies the dietary laws of their religion." *McElyea*, 833 F.2d at 198. This right is clearly

14  established in the Ninth Circuit. *Shilling v. Crawford*, 536 F.Supp.2d 1227, 1236 (D. Nev. 2008) (citing

15  *Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir.1997); *Ward*, 1 F.3d at 876; *McElyea*, 833 F.2d

16  at198). The court finds Sloane's right to a kosher diet during Passover fits squarely within these clearly

17  established constitutional protections. Under a qualified immunity analysis, the issue now is whether

18  McNeely and/or Prince violated Sloane's constitutional right.

19      <u>a. McNeely</u>

20      As the record shows, McNeely advised ESP administrative personnel that Sloane was approved

21  for a kosher diet during Passover. (Doc. # 61-1, Ex. A-1 at 5.) He also informed ESP culinary personnel

22  of the approved Passover menu. (*Id.* at 7-9.) Despite Sloane's allegations to the contrary, ESP diet logs

23  indicate ESP provided Sloane with approved items from its Passover menu during Passover of 2010, i.e.

24  between March 29, 2010 and April 7, 2010. (Doc. # 61-1, Ex. A-4 at 13-16.)

25      Further, as mentioned above, one of McNeely's memoranda to food service staff reads, in

26  pertinent part: " Non 'Kosher for Passover' products may not be consumed from March 29 until one

27  hour after sundown on April 6, 2010. The attached Kosher for Passover menu is approved for . . .

28                                                  23

S. Sloane . . . ." (Doc. # 61-1, Ex. A-2 at 7.) McNeely knew Sloane was entitled to kosher for Passover food items during Passover in 2010 and, based on the record, Sloane received those items. The record also shows the 2010 Passover menu items were substantially similar to the 2009 Passover menu items (Doc. # 61-1, Ex. A-2 at 8-9, Ex. A-3 at 11), and Sloane has not alleged any constitutional violations relating to his Passover meals in 2009.

As a result, the court finds McNeely has met his burden on summary judgment of demonstrating the absence of a genuine issue of material fact regarding Sloane's receipt of kosher for Passover meals. McNeely has demonstrated that no genuine factual issue exists as to whether Sloane's constitutional rights were violated (*Saucier*'s "first" prong).

Even if, however, Sloane were able to establish this contention, a viable good-faith defense (i.e., by providing the same kosher-style meal as in prior years) inures to McNeely because the "unlawfulness" of the alleged non-kosher meal was not "apparent" to McNeely. *Anderson*, 483 U.S. at 640. His mistake, if any, as to the kosher meal was reasonable under the circumstances. *Saucier*, 533 U.S. at 205; *Kennedy*, 439 F.3d at 1061.

The burden now shifts to Sloane to demonstrate with specific evidence the existence of a genuine issue of material fact in this regard. *See Matsushita*, 475 U.S. at 586.

Sloane presents no specific evidence to create a genuine issue of fact in this regard. Specifically, Sloane presents no competent evidence to support his claim that "[t]he Passover 2010 Menu clearly shows that ESP stock food was used." (Doc. # 68 at 16.) Accordingly, the court finds no genuine factual issue exists regarding whether Sloane received kosher for Passover food items during 2010 Passover. As a consequence, the court concludes McNeely did not violate Sloane's constitutional right to food sufficient to sustain him in good health that satisfies the dietary laws of his religion. The court therefore recommends McNeely is entitled to qualified immunity on this aspect of Sloane's First Amendment claim. *See Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 711 (9th Cir. 2010) (a defendant is entitled to qualified immunity if there is no constitutional violation). Accordingly, the court recommends that the Motion for Summary Judgment (Doc. # 61) should be granted in McNeely's favor with regard to this aspect of Sloane's claim.

1    b. Prince

2        With regard to Prince, Sloane's allegations are limited to Prince's response to his emergency

3   grievance on March 29, 2010. NDOC Administrative Regulation ("AR") 740.10 is titled "Emergency

4   Grievance Procedure." (Doc. # 84-2, Ex. F at 60.) Section 3 of AR 740.10 states "[t]he highest-ranking

5   staff member on duty . . . shall immediately take any corrective measures necessary to prevent *a*

6   *substantial risk of injury or breach of security*." (*Id*. at 61) (Emphasis added.) As Prince contends, he

7   had no authority to retrieve kosher for Passover food items for Sloane, or investigate Sloane's grievance,

8   pursuant to AR 740.10. Sloane's grievance contained no allegations amounting to a substantial risk of

9   injury or breach of security.

10       A prison official deprives an inmate of a constitutional right within the meaning of section 1983,

11  "if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which

12  he is legally required to do that causes the deprivation of which complaint is made." *Preschooler II*, 479

13  F.3d at 1183 (internal quotations and citations omitted). Here, Sloane has not challenged the legal

14  validity of AR 740.10, so the court presumes that regulation is not unconstitutional. Prince demonstrates

15  that his conduct was in clear accord with AR 740.10. Consequently, Prince was neither legally required

16  to provide Sloane with kosher food in response to Sloane's emergency grievance, nor was he required

17  to investigate the source of Sloane's grievance. Prince did not do anything, or fail to do something, that

18  he was legally required to do.

19       The court therefore finds Prince has demonstrated the absence of a genuine issue of material fact

20  regarding whether he caused the alleged deprivation of Sloane's constitutional rights. The burden now

21  shifts to Sloane. *See Matsushita*, 475 U.S. at 586. Nothing in Sloane's opposition to Prince's motion

22  presents a genuine factual issue regarding Prince's legal obligation to have acted to provide kosher for

23  Passover food in light of AR 740.10. Sloane has failed to meet his burden on summary judgment. As

24  a result, the court concludes Prince did not violate Sloane's constitutional rights. The court recommends

25  Prince is therefore entitled to qualified immunity. *See Rodriguez,* 605 F.3d at 711 (a defendant is entitled

26  to qualified immunity if there is no constitutional violation).

27       Accordingly, the court recommends Prince's Motion for Summary Judgment (Doc. # 84) should

28

be granted. For the same reasons, the court recommends Sloane's Motion for Partial Summary Judgment (Doc. # 78) should be denied.[14]

**C. Sloane's Motions to Strike**

In support of their arguments in favor of qualified immunity, Defendants refer to an allegation Sloane included in his original complaint but omitted from his amended complaint.[15] (Doc. # 61 at 17; Doc. # 84 at 17.) Sloane moves to strike Baker, McNeely and Willis's motion for summary judgment or, alternatively, their qualified immunity defense, on the grounds that they rely on "facts that do not exist to support the false defense [of qualified immunity] . . . ." (Doc. #67 at 6.) Sloane moves to strike Prince's motion entirely on the grounds that it contains duplicate and irrelevant arguments pertaining to qualified immunity on the issue of Seder supplies. (Doc. # 91 at 5-7.)

The court presumes Sloane's motions are filed pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. Rule 12(f) allows a party to seek an order striking "from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f) (emphasis added). A motion for summary judgment is not a pleading and, therefore, may not be the subject of a motion to strike under the express language of FRCP 12(f). FED. R. CIV. P. 12(f) ("The court may strike from a *pleading* . . . ."); *see Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885-86 (9th Cir. 1983). In any event, as the court has not relied on any of these extraneous factual assertions in ruling on Defendants' motions for summary judgment, Sloane's motions to strike are denied as moot. *See, e.g., Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*, 436 F.Supp.2d 1095, 1109-10 (C.D. Cal. 2006).

---

[14] The factual findings the court has made concerning Prince's motion directly contradict the allegations Sloane makes in his motion for partial summary judgment against Prince (Doc. # 78). For example, Sloane alleges Prince "had a duty to ensure that the Plaintiff was fed a meal the evening of March 29, 2010, and furthermore, that the meal was in fact 'kosher for Passover.'" (Doc. # 78 at 7.) Sloane claims Prince "had a duty to himself to investigate the emergency the Plaintiff declared by way of an emergency grievance," (*id.*) and that Prince "became responsible for the First Amendment violation when he refused to correct the violation in the course of his supervisory responsibilities . . . ." (*id.* at 10). However, the court has specifically found, pursuant to AR 740.10, that Sloane's emergency grievance did not impose a legal obligation on Prince to provide Sloane with kosher food, or to investigate Sloane's emergency grievance. Thus, Sloane's position in his motion for partial summary judgment is unsupported by the record and, therefore, should be denied.

[15] Defendants note that Sloane's original complaint contains an allegation that his dinner cart arrived at his cell at 3:45 p.m. on March 29, 2012, one minute after the Seder supplies arrived at ESP. (Doc. # 61 at 17.) Defendants contend this allegation shows the delay in Sloane's receipt of the Seder supplies was not their fault; rather, Defendants state the delay was attributable to the Aleph Institute's late delivery. (*Id.*) Thus, Defendants argue a reasonable correctional official unfamiliar with the significance and temporal sensitivity of Seder supplies for followers of the Jewish faith would not have known to act differently, i.e., deliver Sloane's Seder supplies earlier, under these circumstances. (*Id.* at 17-18.)

26

# IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order:

1.   **DENYING in part** Defendants Baker, McNeely and Willis's Motion for Summary Judgment (Doc. # 61) with respect to the Seder supplies aspect of Sloane's First Amendment claim;

2.   **GRANTING in part** Defendants Baker, McNeely and Willis's Motion for Summary Judgment (Doc. # 61) with respect to the kosher for Passover food aspect of Sloane's First Amendment claim, which involved McNeely only;

3.   **GRANTING** Defendant Prince's Motion for Summary Judgment (Doc. # 84); and

4.   **DENYING** Sloane's Motion for Partial Summary Judgment (Doc. # 78) and his Motions to Strike (Docs. # 67, #91).

The parties should be aware of the following:

1.   They may file, pursuant to 28 U.S.C. section 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.   This Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

DATED: October 30, 2012.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE